Bland, Chancellor.
To have a correct conception of the matter in controversy, it will he proper to recollect, that the city of Baltimore was laid out, and has grown up round the margin of a cove of the Patapsco river, near the mouth, and to the westward of the stream called Jones’ Falls, which passes through the city; that much of the margin of this cove was originally a marsh inundated at every reflux of the tide; that as the *454 only navigable entrance to this cove, is by a narrow channel from the east, every encroachment upon it, by wharfing or making fast land, following the directions of the streets of the city, must be from the north, from the west, or from the south; and that Gay street approaches this cove, now called the basin, in a direct line from the north, and terminates at its intersection, at right angles with Pratt street, a part of the south side of which passes a few feet above the head of what is now called Smith’s dock.
The land now claimed is a strip about twenty-nine feet wide, lying between the east side of Smith’s dock, and an elongation of the east side of Gay street, from the south side of Pratt street into the basin, a distance of about eight hundred and sixteen feet; with an east extension, at right angles from its south end, of about eighty-six feet. It appears, and is admitted, that the tide water of the basin originally flowed a considerable distance above the present termination of Gay street; that the patent for the tract called Cole’s Harbour, included the lands, on which this part of the city was laid out, only to the line of the tide water as it originally flowed, and no further; that no patent had ever been issued for any part of the land which was originally covered by the tide water of the basin; that the whole of the strip of land in question, at one time, formed a part of the bed of this navigable basin; that John Smith, who was the owner of a lot on Gay street extending to the tide, applied to the port wardens of Baltimore for permission to extend his wharf into the basin, together with ten or fifteen feet of Gay street; that, on the 26th of September, 1786, permission was granted to extend his wharf, as prayed, until it intersected a line drawn east from a point eighty feet south of the south side of Conway street, and parallel thereto, together with eleven feet of Gay street continued a long the front of said -wharf; but instead of taking only eleven feet, the wharf was carried out, as it now is, to about twenty-nine feet on Gay street; that this strip of land had been altogether made and raised upon the bed of the basin by John Smith and others, who completed it about the year 1796 ; and it was not, in any sense, an alluvion, or attached as such to any other fast land; that, upon ground made near and fronting the whole of this strip of land, warehouses had been built; and that John Smith, and those who claimed under him, for some years, charged and received wharfage; but in the year 1803, the city began to collect wharfage, and continued their collections until about the year 1828.
*455 These claimants found their prayer for patents upon the facts, that the state had never, at any time, either by a grant from the Land Office, or, in any other legal manner, parted with its right of soil, in the land in question to any one; and that it is such a piece of grantable land for which they now may; or any one else might have obtained a patent, according to the rules of the Land Office, upon payment of the composition money.
On the other hand the caveators contend, that no patents can be allowed to issue; because the strip of land in question was a public wharf on which they, during many years, had charged and collected wharfage; and the right of soil in all such wharves had been virtually vested in them by the act which gives them the right to charge and collect wharfage; (a) since to give all the uses of land is, in effect, to give the land itself. And also because, even supposing no right had been vested in them by that act of Assembly ; yet it was sufficient to prevent the issuing of a patent, for them to shew, that the state had previously parted with its right of soil to any one else; or that this ground was not the subject of a grant from the Land Office. To shew which they urged, that this ground was an extension, not of any land belonging to John Smith, or those claiming under him, but of a part of Gay street; and consequently belonged as a rightful incident to the patentee of Cole’s Harbour, or those claiming under him ; who alone were the owners of the ground over which Gay street passed, and the incidents and appurtenants thereto. Or, if, indeed, the right of soil in this strip of land had not accrued to and vested in those holding under the patent for Cole’s Harbour, as a legal incident of their title; yet, that the ground in question, in its present condition, charged as it was with a public use, was not the proper subject of a grant from the Land Office.
The Land Office has always been, as it now is, the general market in which all public lands have been offered for sale; and into which any one capable of holding real estate might come and purchase according to the prescribed rules and terms of sale. This office, so peculiar in its nature, evidently originated from the circumstance of the right of soil of the whole country having been vested exclusively in the Lord Proprietary as a part of his private estate; and from the whole territory being at that time vacant, and held by tribes of savages in their national capacities, and not as *456 property belonging to individuals in separate parcels. (b) The charter of Maryland not only vested the right of soil in the Lord ¡Proprietary, but it also clothed him with certain political and regal powers within his province; and hence, in establishing a Land Office, ,and laying down rules for the sale of the great body of his real estate, he followed, in many respects, the forms which had been adopted in England for the purpose of preventing fraud and imposition in obtaining grants of property from the king ; and all grants of land here were accordingly required to pass under the supervision of the Chancellor; and to be attested by the great seal of which he was the keeper. If the rules of the office were complied with., and the purchase money paid, a grant for the land was issued as of course, otherwise not. (c) Among the earliest act's of the Provincial Legislature was one, which declared it to be illegal for any individual to purchase lands of the Indians to the prejudice of the rights of the Lord Proprietary. (d)
The mode of proceeding for the purpose of contesting the right to a patent by a caveat, being interposed against its issuing, was substantially the same here as in England, (e) From the judg *457 ment pronounced by the Chancellor, upon a caveat, there was no appeal to a higher court as from a decree in an ordinary contro *458 rersy between individuals; because the decision on a caveat was not, in any way, conclusive of the right. If the patent was *459 refused, on account of the rules of the office not haying been complied with, still the Lord Proprietary, like the king, might dispense with all rule, and give a patent at his pleasure ; or if, on the other hand, a patent were allowed to issue; yet the patentee could only take subject to all prior claims, incumbrances and equities. Therefore it could have answered no good purpose to allow an appeal from any decision of the Chancellor as judge of the Land Office. (f)
Under the proprietary government, Ihe Land Office was always open, as the market, where any part of the vacant lands of the province might be purchased. But to this rule there were excep *460 tions. The Lord Proprietary, from time to time, withdrew large bodies of his lands from this market, which he declared should not be sold there until his farther pleasure was made known; and therefore to no part of such tracts, called reserves, could any title he acquired from the Land Office. (g) But these reservations were only restrictions upon the ordinary mode of selling; for the Lord Proprietary sold, leased, or gave away these reserves as well as other parts of his territory at his pleasure; of which there are a multitude of instances to be found among the records of the Land Office. And besides such regular and irregular grants, emanating from the Land Office, or direct from the Lord Proprietary himself, the Legislature, with his consent, appropriated to, or authorized the acquisition of land by individuals in various other peculiar modes. (h)
By the Revolution all lands which then belonged to the Lord Proprietary became absolutely vested in the state, and were so held for the public benefit; not however, as under the government of the Province, as the estate and for the private emolument of an individual, but for the use of the public; and so considered, the General Assembly, as ‘the trustees of the public,’ with a view to general convenience, made several reservations, which they declared should not be sold in the Land Office. (i) In England, it was formerly held, that the king, by virtue of his prerogative as sovereign, might give away or dispose of, at his pleasure, any of the public property. But of late this pernicious prerogative has been considerably curtailed; and, in some instances, the prodigal grants of the king have been totally annulled, and the property resumed by parliament for the public benefit, (j) In Maryland the right of disposing of the public property, in all extraordinary cases, has devolved on the General Assembly; the executive branch of the government having been expressly prohibited from exercising any prerogative by virtue of any law of England. But although the Legislature may correct mistakes or dispense with any of the rules of the Land Office, so as to enable a bona fide purchaser to obtain a patent for the land intended to be bought by him; or may dispose of the public lands, in any way, for a good and valuable consideration, either as rewards to public benefactors, as to the soldiers of the revolution, (k) or for the purpose of attaining some object of general utility. Yet I cannot concede, *461 that they may, as the Lord Proprietary often did, give away the public lands, at pleasure, to their favourites, regardless of any benefit to the people. (l)
*462 Since the revolution it has continued to be an established principle, that no appeal can be allowed from any decision of the *463 Chancellor, as judge of the Land Office; and, indeed, there seems to be no more reason now why an appeal should be allowed, than *464 under the Proprietary Government. If the patent should have been improperly refused by the Chancellor, or because it could not *465 be granted consistently with the rules of the Land Office; and the claim of the applicant should, nevertheless, have a solid foundation in equity and justice, the Legislature, exercising a large discretionary power over such anomalous cases, has never failed to provide for the correction of mistakes, or to grant relief by dispensing with those settled rules by which the party had been excluded from the benefit of a patent. (m) And, on the other hand, it has always been an established rule, never lost sight of in the office, that whenever there is any doubt as to the validity of the caveator’s objections; and it appears, that they may be as well, and as effectually considered in the ordinary and regular course of judicial proceedings, after the claimant’s legal title has been perfected; and that the pretensions of the caveator cannot be prejudiced, to permit the patent to be issued. (n)
From which it appears, that although it may be the duty of the Chancellor, in controversies of this kind, on the one hand, to intercept patents about to be irregularly issued, to quiet possessions and prevent litigation; (o) so, on the other, he has ever held it to *466 be his imperative duty to smother no reasonable or plausible claim, or to withhold it from the deliberate examination of the ordinary and regular courts of justice. (p)
Some time after Baltimore had been laid out as a town the Legislature passed a law, by which a considerable addition was made to it; and, among other things, it was declared, that certain commissioners, seven in number, appointed to see the present and former acts, relating to the towns before mentioned, Baltimore and Jones’ towns, put in execution; and cause them to be carefully surveyed by their outlines, therein including the branch, to wit: Jones’ Falls, over which the bridge is built; and shall, from time to time, for preventing disputes, cause all the lots taken up and improved, or that shall thereafter be taken up, &c. to be regularly surveyed, substantially and fairly bounded and numbered. And all after purchasers of lots, whether before or after the passing of this act, shall be deemed to be within the said town; provided their lots be within the outlines thereof; and shall have as good estate in their lots, as if taken up, improved, and paid for under the original laws erecting the said towns. And that all improvements of what kind soever, either wharves, houses, or other buildings, that have or shall be made out of the water, or where it usually flows, shall, as an encouragement to such improvers, be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever. (q)
This law, it is obvious, according to the principles of justice, applicable to the subjects of which it speaks, can only be so construed as to authorize the owners of lots bounded by the tide of the basin to acquire a right to vacant land without applying to the Land Office, and without paying for it the stipulated price of vacant land. It operates as a legislative grant, for and in consideration of certain improvements, from which material and important benefits would result to the public. And the improvements being the consideration upon the formation of which alone the state parts with its right to the soil covered by the waters of the basin; it is clear, that no right can vest under it, until the specified improvements have been completed; for, if they should be left in an unfinished condition, it would amount to an abandonment of the right to acquire a title in that manner, (r) This, however, is *467 a mode of acquisition of which none can take advantage but natural persons who hold lots bounded by the tide-water of the basin; in whom and their heirs the acquisition is to vest as an inheritance. It is obvious, therefore, that the city itself could acquire no right of property in this way; and besides, a wharf, one of the kinds of improvements mentioned as an example, being an extension of fast land into the water, the city never had any such land upon or from which any improvements of the sort could he made or extended, (s) But even natural persons can avail themselves of this privilege only in so far as the acquisition may be made by improving their own lots in such a manner as not to extend them in front of, or between the navigation of the basin and any public street or other lot belonging to an individual, (t) As, for example, John Smith, under this law, could not have acquired a right to any land, covered by the waters of the basin, by improving upon, or filling it up in any other than a south direction; because, in doing so, he would have crossed, or cut off the navigation from the next adjoining street or lot. (u) In this instance, however, he improved upon and filled up land which was, confessedly, not an extension of his own lot, but a part of Gay street. It is, therefore, perfectly clear, that no right could have been acquired to this strip of land by John Smith, or any one else, under this act of Assembly.
This act of the Provincial Legislature had prescribed a mode whereby the owners of lots in Baltimore might acquire a title to portions of the land covered by the navigable waters of the basin without applying to the Land Office. But, according to the English law, the king can at present make no grant in derogation of the rights of navigation and fishery; (w) in which respect also the Lord Proprietary had been expressly restrained by his charter; (x) and, as it would seem, under a sense of that restriction, by one of his instructions, he had directed his surveyors, that, in surveying old tracts, whereof part might be found to lie in the water, to be careful in certifying whether it had been washed away, or had been an error in the original survey. (y) From which, and the proceedings in the Land Office, an opinion seems to have been entertained by those who might be presumed to have been suffi *468 ciently well informed of the law of the office, that here, as in Virginia (z) a patent gave title, at most, no further than to low water mark; (a) and that no land, covered by any navigable tide-water, could be made the subject of a patent from the Land Office of Maryland. (b) Upon a more careful consideration of the whole subject, however, it has been finally settled, that the bed of any of the navigable waters of the state may be granted, and will pass if distinctly comprehended by the terms of an ordinary patent, issuing from the Land Office; subject only to the then existing public uses of navigation, fishery, &c,; which cannot be hindered or impaired by the patentee, or those claiming under him. (c) *469 And, by a late act of the Legislature, it is declared, that individuals may locate and obtain an exclusive title to oyster-beds, in any navigable waters, in the manner therein prescribed, without applying to the Land Office. (d) And, as it would seem, the General Assembly may, for the benefit of the public, grant to an individual any navigable water together with the land which it covers, (e)
At an early period an obscure and unsettled notion seems to have prevailed, that the owners of the uplands had a sort of inchoate or pre-emptive right to the contiguous marshes, lying between their uplands and the shores of the tide, (f) And such marsh was, by the land law of 1699, declared to belong absolutely to the land to which it was adjacent; (g) but, that law has been long since repealed, and I find nothing which shews, that the owner of a tract adjoining navigable water could claim any sort of title to any part of the land covered by the tide beyond low water mark; because of its being immediately adjacent to the land held by him. (h)
*470 It is admitted, however, in this case, that the strip of land in question was not included within the boundaries of the tract called Cole’s Harbour, of which John Smith’s lot was a part; and, that no patent had been granted for it to any one; whence it is clear, that, as it might have been, at any time, made the subject of a distinct grant; and could not be attached to any other tract, as an incident or appurtenant, and no title to it had been acquired under the act allowing owners of lots to extend them into the water, it must now be considered as the property of the state, (i)
But considering the bed of this basin as being property, like all the other lands of the state, which are covered with navigable water, to which a legal title might have been acquired by any one from the Land Office, subject to the uses of navigation, &c.; or as being property, a title to portions of which might have been acquired according to the act allowdng certain lots to be improved ; (j) yet it appears, that both of those modes of acquiring title to it were, in some respects, modified by a subsequent act of Assembly, by which it is declared, that the port wardens should ascertain the course of the channel; that no wharf should be extended into the basin, so as to divert the course of the channel; and that no person should make a wharf without the permission of the port wardens; who were directed to prevent any obstruction to the navigation, and to keep the harbour clear for the use of *471 vessels. (k) Whence it appears, that no wharf can he extended beyond the margin of the channel, even with the consent of the port wardens. And these port wardens having, as directed by this law, made a survey designating the lines of the channel, that is the line, now commonly called the port warden’s line, beyond which no improvements can be made into the basin.
These provisions do certainly restrict the mode of acquisition given by the act for making improvements; (l) and assist in giving perpetuity to the public right of navigation with which the soil was originally encumbered, by requiring, that care should be taken to keep it always free from obstruction. This last act, it is therefore evident, cannot be so construed as to give any additional facilities to acquiring title to, and making fast land of any portion of the bed of the basin; but, on the contrary, as directly curtailing those means by which a title to, and the use of it, might previously have been obtained. The port wardens could give to no one a right to encroach upon the basin in any direction, or to make a wharf where, prior to the passage of this law, he had no such right; they might limit and control the then existing powers of individuals, but could give them no new powers or rights whatever. This is the view which has long since been taken of this law by the courts of justice, (m)
Hence it is manifest, that the permission given by the port wardens to John Smith, to fill up and build a wharf on eleven feet of Gay street, was wholly illegal and a mere nullity; and as to the farther encroachment upon Gay street, it has not been intimated, that Smith and others had even a pretext or shadow of legal authority to do what has been done by them.
It is perfectly clear, from the proofs, that the strip of land in question cannot, in any way, be regarded as an alluvion, the right to which would accrue to the owner of the adjacent land to which it had fastened; (n) but having been made, and built up, as a *472 wharf, by John Smith and others, on land which it is certain did not belong to them, it follows, that it must, like all such improvements which a wrong doer puts upon the land of another, become the property of him to whose land it has been affixed. So that this wharf has long since, in fact, become the absolute property of the state to whom the soil upon which it wms built most unquestionably belonged.
But it has been urged, that the whole of this strip of land called Smith’s wharf, is a public wharf, for the use of which the city of Baltimore has, for a long series of years, charged and collected wharfage; and, therefore, that the right of soil in it has been expressly vested in the city by the act allowing the corporation to charge and collect wharfage; (o) because as wharfage was the only benefit which could be derived from this land, the act which gave that sole benefit, virtually and necessarily thereby gave an absolute right to the soil itself. And further, that the granting of a patent would be incompatible with the rights of the public in general, if not with those of the city in particular; and, therefore, it ought not to be allowed to issue, since it could be attended with no good, and would inevitably be used as the means of litigation and strife.
In England the subjects which may be granted by the king are as numerous and as various as the sorts of property, and the kinds of prerogatives held and enjoyed by him; the most of which he may, by a patent under the great seal, grant to an individual. (p) But here no department or branch of our limited government has been entrusted with any such large and uncontrolled power of making grants to individuals. The executive has been prohibited from exercising any such prerogative; and the Legislature have only so much of a discretionary power delegated to them as will enable them to act within their proper sphere for the public good. No *473 patent can issue from the Land Office, but according to its settled rules ; or for any thing not allowed by law to be sold there according to those rules. Nothing can be sold in the Land Office, but the state’s right of soil in land, and the improvements affixed thereto as parcel thereof. The title of the state of -which it there makes sale, is only in such land as had never before been granted to any one; or where an individual had done some acts towards acquiring a title which he had neglected to complete; or where the complete title which had been granted, had fallen back, or escheated for want of an heir or successor of the original grantee, or him who claimed under him, who could take and hold.
Hence it is always distinctly understood, that every one who goes into the Land Office, with an intention to buy, only proposes to purchase of the state its title to lands held in one or other of these modes; because nothing else can be sold there. A patent from the Land Office can convey nothing else; it cannot give to the grantee any franchise or privilege which is not necessarily and always embraced in a grant of the legal title to the land itself; it cannot give to the grantee a mere right of way; or a right to demand and collect toll or wharfage any where; because such things are not, and cannot be sold or granted in the Land Office. And, therefore, no question concerning any right to demand and receive toll or wharfage any where can be incidentally heard and decided by the Chancellor upon a caveat in the Land Office.
But if land, to which the state has a title, is in any way incumbered, such incumbered title may well pass by a patent from the Land Office; and the grantee will take and hold, subject to such incumbrance. As where the owner in fee, after having leased the land for years, died intestate and without heirs ; so that his right escheated. It was held, that the grantee from the state, under an escheat warrant, could only take subject to the lease. (q) So, too, where the land had been mortgaged before the title reverted to the state, (r) And where the state had granted land covered with navigable water; it was held, that the grantee could only take subject to all the public rights of navigation, &c., which he could not in any manner obstruct or impair. (s)
*474 From which it necessarily follows, that if a public street or road passes over any land belonging to the state, the patentee of such land can only take subject to such right of way. A wharf, in a public port, is, as to this matter, governed by the same general principles of law. The use of a wharf, like that of a road or a navigable river, may belong to the public, or it may be held entirely separate from the soil itself, upon which the wharf has been built. And, consequently, a grant of the state’s title to the land cannot, in any manner, affect a pre-existing right to the use of the wharf any more than a grant of the bed of a navigable river, or of the land over which a road passes, can affect the previously vested usufructuary interest of the public, or of any individual. (t)
And, therefore, although it is in general true, that it is enough to prevent the issuing of a patent, for the caveator to shew an outstanding legal title any where, not belonging to the state; (u) yet as no such title has been shewn here, I am clearly of opinion, that a patent may well issue for this strip of land; because the grantee can only take it, as it is, subject to all the uses with which it may-have been previously charged.
Whereupon it is Decreed, That the said caveat of The Mayor and City Council of Baltimore, against the said certificate of Isaac McKim, &c., be and the same is hereby set aside and overruled with costs, to be taxed by the register.

 1827, ch. 162.

 Gifford v. Lord Yarborough, 15 Com. Law Rep. 405.

 Cunningham v. Browning, 1 Bland, 299.

 1649, ch. 3; 179S, ch. 82, s. 7; 1802, ch. 45; 1816, ch. 136.

 Cunningham v. Browning, 1 Bland, 299.
Coursey v. Hemsley. — At the Land Office in the State House at the city of Annapolis, Anno Domini, 1721.
Present the honourable Philemon Lloyd, Esquire, his lordship’s deputy secretary of this province, and sole judge in the determination of ail differences and disputes arising upon land affairs within the said province.
A hearing was then moved for by Mr. James Heath, of counsel for Elizabeth Coursey of Chester River in Queen Ann’s county, and a petition by him produced, on behalf of her son William Coursey, a minor and legatee of Col. William Coursey, late of Queen Ann’s county aforesaid, Esquire, deceased. Complaining that a certain Vincent Hemsley of Queen Ann’s county, upon the 22d of September, 1720, had obtained, out of his lordship’s Land Office, a special warrant for the resurveying of two hundred and thirty acres of vacant cultivated land; which said warrant, as the petitioner afterwards understood, was executed upon the cultivation of a certain tract of land called Coursey upon Wye, heretofore, that is, upon the 12th of June, 1695, surveyed for Col. William Coursey, late of Queen Ann’s county, deceased ; and the said William, in his last will and testament, together with a greater part of the tract, being nine hundred and twenty acres in all, devised unto William Coursey, a minor as aforesaid; and that a certificate of the resurvey thereof had been already returned unto his lordship’s Land Office, in order to have his lordship’s grant thereupon, according to the course of the office. She, therefore, prayed to be heard by her counsel against the passing of Letters Patent upon the resurvey aforesaid, according to a caveat heretofore by her lodged in the office for that purpose.
But the said Hemsley, by his letters to the above Philemon, alleged an unpreparedness to come to a hearing at that time, and prayed a continuance of the cause; *457 wherefore it was thought convenient upon his petition to postpone it until the Provincial Court in October following. Whereupon James Heath, of counsel for the petitioner, moved on his client’s behalf, that no further or other process should be granted unto Yincent Hemsley or any other person in relation to the said tract of land called Coursey upon Wye; but if any error or defect be found therein, other than that which was already moved by Yincent Hemsley aforesaid, that she might have the liberty in the pre-emption of his lordship’s favour therein, which was likewise granted avid ordered accordingly.
October Provincial Court being the appointed time for hearing of this cause, Vincent Hemsley did neither appear by himself nor his counsel; but sent a petitionary letter urging many great inconveniences, that he must necessarily labour under if he were obliged to come to a hearing at that time. Wherefore, in favour of justice, and to prevent any censures of deciding his cause unheard, a further time was granted him; and a hearing appointed to be on the 29th of January, 1721, at the dwelling-house of Philemon Lloyd, the judge in land affairs aforesaid, as a place convenient unto both parties, and where it was supposed Mr. Hemsley could most conveniently attend.
At which appointed time, viz: the 29th of January, 1721, both parties appeared; and the complainant then moved, that the said Hemsley’s special warrant, with the certificate of resurvey thereon, made and returned into his lordship’s Land Office, for two hundred and thirty acres of cultivated land, part of Coursey upon Wye aforesaid, might be set aside and declared null and void; and that a minute thereof might he made in the margin of the record book, where the special warrant aforesaid is recorded. Seeing tiiat the said Hemsley hath alleged the said two hundred and thirty acres of cultivated land is part of and included within the lines of a greater tract called Coursey upon Wye, heretofore surveyed for Col. Coursey, deceased, and his lordship’s Letters Patent had thereon, more than twenty years past for the same; and that the said William Coursey, by his last will and testament, devised part of the tract of land "aforesaid, called Coursey upon Wye, unto her said son William Coursey, a minor.
Thereupon the said Yincent Hemsley in justification of his resurvey and return aforesaid alleged in the first place, that notwithstanding the cultivated land, by him lately taken up, had been heretofore surveyed by Col. William Coursey, in his lifetime, as is suggested, and was a part of a greater tract called Coursey upon Wye; yet that the same survey, in law, and according to the strict rules of the office, is deemed and held to be null and invalid as if such survey had never been made; and as all other pretended surveys are deemed to be when made and done without sufficient authority from his lordship’s Land Office. And further alleged, that tho land warrant, upon which the said survey was grounded, was upon assignment from Col. Peter Lawyer, for nine hundred and twenty acres, part of a warrant for two thousand three hundred and forty-five acres, dated the 27th of February, 1694, which said warrant, upon inspection, was found to have been executed upon other land before the time of the assignment aforesaid, as appears by an entry upon the land records, where tho said warrant is recorded; and further said, that the case of the said warrant is not at all mended by what follows upon record, viz: that new caution was given for the same. Seeing that the caution is not said tobe given by Col. William Coursey, nor by any other person for his use; and, consequently, no warrant at all to affect that, nor any other lands, nor gave any authority to the surveyor *458 for laying out the tract aforesaid, called Coursey upon Wye; which said tract of land, as the said Hemsley alleged, for the imperfections aforesaid, remained still to be vacant, and subject to his special warrant, laid upon the cultivation thereof as aforesaid.
Secondly. — It was alleged, that although the warrant upon which the surveyor had laid out Coursey upon Wye, should be held and deemed to be good and sufficient warrant to the surveyor for the taking up of so much of that tract called Coursey upon Wye, as had not before been cultivated; yet that the survey thereof, as far as it related to any part of the cultivated lands must necessarily be null and void; such lands being excepted in all common warrants, according to the usual form, ‘lands not already laid out for, nor cultivated by any person, nor lands reserved for his lordship’s use;’ but that the lands so by him, the said Hemsley, taken up, by virtue of his lordship’s special warrant aforesaid, were cultivated at and before the time of the survey of Coursey upon Wye, no one will pretend to deny. Wherefore as the said lands would not be affected by the common warrant aforesaid, allowing it to be a good warrant, which, however, he doth not grant, he prays that his lordship’s Letters Patent may be made out to him, the said Vincent Hemsley, according to the course of the office, for the two hundred and thirty acres of cultivated vacant land, according to his certificate of survey thereof already made and returned into his lordship’s Land Office.
Whereupon the complainant replied to the first allegation, and saith, true it is that the warrant upon which the survey of the tract of land called Coursey upon Wye, is grounded, was by an assignment from Col. Peter Lawyer for nine hundred and twenty acres of land, part of a greater warrant for two thousand three hundred and forty-five acres, which said warrant, as is above alleged, and according to a record thereof, was found to have been executed upon olher lands before the assignment of the nine hundred and twenty acres, part thereof, unto Col. William Coursey aforesaid ; but the petitioner also maintained, that it is also found, upon the same record, after the discovery of the imperfections of the warrant aforesaid; and, it is very probable, made by Col. Coursey himself for the greater security of his land, another entry is likewise found, next after the entry and discovery aforesaid, viz: upon the 8th of May, 1696, new caution is given for the same ; which the complainant saith she is humbly of opinion was then accepted of by the Lord Proprietor as a full compliance with his conditions of plantation, it never having been practiced by his lordship, nor any of his noble ancestors, to take advantage of inadvertent slips or mistakes ; but always when discovered have allowed the liberty of amending the same, as in this present case. And the petitioner farther saith, that although it be not expressly mentioned on the face of the records, that the new caution given was on the part of the said Col. William Coursey; yet it is implied, as a most consonent reason, that such new caution given for the mending the defects in the warrant aforesaid did affect the assignment made unto Col. Coursey’s part of that warrant, equally with all other parts thereof it being declared upon record, that new caution was given for the same.
As to the second plea of the said Hemsley, that no common warrant would affect cultivated lands which, as he alleged, are excepted in all such warrants; the complainant answereth and saith. Notwithstanding it be at the present, and for many years hath been the practice of the Land Office to make an exception of all land already surveyed, cultivated or reserved for his lordship’s use; yet, that the practice of the office was not the same, at the time of laying out the tract of land called *459 Coursey upon Wye, the cultivated part whereof is now in dispute. And she further asserteth, that all common warrants, at the time of the making of that survey were qualified, and gave sufficient power to the surveyors to lay out, survey and make returns of cultivated as well as uncultivated lands, as in the present case now in dispute; and to prove the practice of the office at the time of laying out the tract aforesaid, the complainant produced an original common warrant, dated the 20th of June, 1694, and signed by Col. William Diggs and Major Nicholas Sewall, secretaries of this province; and eight months after the time of making out of the common warrant for two thousand three hundred and forty-five acres unto Col. Peter Lawyer, out of which warrant the assignment of nine hundred and twenty acres was made unto Col. Coursey aforesaid. The complainant thereupon argued, that it had been the ancient practice of the office to except such lands only as had been formerly surveyed or resurveyed for his lordship’s use; hut that all cultivated land of which time, the lands, now in dispute, were subject to common warrants, as well as clear vacant lands. She therefore prayed, on behalf of her son, a minor and legatee of Col. William Coursey, deceased, that the special warrant for the two hundred and thirty acres of land aforesaid, so as before by Vincent Hemsley obtained and executed upon the cultivation of that part of the tract called Coursey upon Wye devised unto William Coursey a minor as aforesaid, together with the certificate and other proceedings thereon, might be declared nuil and void, and that an entry be made thereof in the margin of the record book, where the special warrant aforesaid is recorded, setting forth the insufficiency and invalidity of the special warrant and return aforesaid.
29th January, 1721. — Lloyd, Judge. — The arguments and allegations of both parties being fully heard and duly considered, it is adjudged, pronounced and declared, that the reasons offered by the petitioner in maintenance of a caveat heretofore entered in the Land Office, at the making out Letters Patent in the name of Vincent Hemsley, for the land in dispute, are good and sufficient, according to the course and practice of the Land Office to bar the said Vincent Hemsley from any further proceedings thereon; and it is likewise declared, that the certificate and resurvey of two hundred and thirty acres of land aforesaid, part of Coursey upon Wye, already returned into his lordship’s Land Office by Vincent Hemsley, aforesaid, be held and deemed to be null and void, as being found to lie within the bounds of a more ancient survey. And that an entry hereof be made in the margin of the record book where the warrant of such resurvey is recorded. — Land Records, Kb. E. J, No. 1, fol. 1.

 Ex parte Beck, l Bro. C. C. 578; Ex parte O’Reily, 1 Ves,, jun., 112; Ex parte Koops, 6 Vcs. 599; Ex parte Fox, 1 Ves. & Bea. 67.

 Land Ho. Assis. 92; Smith v. The State, 2 H. & McH. 246.

 1696, ch. 24, s. 7.

 Land Ho. Assis. 346.

 4 Inst. 44; Bac. Abr. tit. Prerogative, F. 2; 1 Plow. His. Ireland, 177; Smollett’s His. Eng. ch. 6.

 1788, ch. 44, s. 20.

 Hepburn’s case, ante 97; 1745, ch. 9, s. 10; 1817, ch. 225; 1822, ch. 57; 1836, ch. 63.
Ross v. Bladen, — The Judges of the Land Office to the Chancellor. — May it please your Excellency. — There having been a dispute in the Land Office of an uncommon and extraordinary nature, in-which Thomas Bladen, Esq. and Doctor David Ross are the persons concerned, we take the liberty, in pursuance of his Lordship’s instructions, by which we are directed, in difficult and unprecedented cases, to desire your Excellency’s advice and assistance, (Land Ho. Assis. 232, 234,) to submit to your Excellency, as Chancellor, a state of the case or matter depending before us together with our opinion, hoping you will be pleased to favour us with your Excellency’s sentiments thereon.
On tile 16th day of January, 1761, Doctor David Ross applied to us in usual form for warrants under the proclamation to resurvey, and he allowed the pre-emption of the following tracts of land, Wills’s Town, Buck Lodge, Sugar Bottom, Turkey Flight, Prized, Lawrence, and. Bigg Bottom, containing 2,254 acres, but as no certificates for those lands appeared to be returned or lodged in the office, which is essential to the issuing of a warrant under the proclamation, Mr. Ross petitioned for, and obtained special warrants to affect the lands aforesaid, having, as your Excellency knows is usual, first paid the agent caution money for the same.
On the 16th day of May following, the undermentioned certificates were returned into the office, signed by Mr. Thomas Cressap, who was deputy surveyor of the county at the times these certificates respectively bear date, viz : Wills’s Town, surveyed in June, 1745, Buck Lodge, and Sugar Bottom, in .Tune, 1746, Turkey Flight, and Prized, in August, 1746, and Lawrence and Bigg Bottom in November, 1746, containing in the whole 2,254 acres; surveyed, as is set forth in the said certificates, for Thomas Bladen, Esq. As the land described in these certificates appeared to be the same tracts for which Doctor Ross had, as we have already observed, obtained special warrants, we thought it our duty to forbid patent issuing to Mr. Bladen till we could examine the records and inquire how it had happened, that those certificates had lain so long dormant. On examination we found in the land records the following entries :
‘October the 2lsf, 1743. — Order issued to the Surveyor of Prince Georges county to lay out for his Excellency Thomas Bladen, Esq. two thousand acres of land, caution to be paid on the return of the certificates, &c.’
‘2,000 acres part of a warrant for 4,012 acres granted Doctor George Stewart the 3d day of February, 1746, and by him assigned to his Excellency Thomas Bladen, Esq. is applied to make good rights to the above warrant.’
‘April the 15th, 1745. — Warrant then issued to the Surveyor of Prince Georges county to lay out for his Excellency Thomas Bladen, Esq. two thousand acres of land, caution to be paid on the return of the certificates, &e.’
‘April the 16& 1745. — Warrant then issued to the Surveyor of Prince Georges county to lay out for his Excellency Thomas Bladen, Esq. three thousand acres of land, caution to bo paid on the return of the certificates.’
‘Rights made good to 2,012 acres part of this warrant by applying so much part of a warrant for 4,012 acres granted said Bladen the 3d of February, 1746.’
That your Excellency may be thoroughly informed, we think it necessary to lay before you a copy of the original warrants, that were issued out of the office in consequence of the foregoing entries, and to state, In a distinct manner, the several *462 tracts, that were surveyed, and for which certificates were returned into the office by virtue of those warrants respectively.
‘L. Gale. — Lay out for the use of his Excellency Thomas Bladen, Esq. two thousand acres of land, and return your certificate or certificates of survey thereof within six months from the date hereof: and for your so doing this shall he your warrant. Given under his Lordship’s Lesser Seal of arms the 21st of October, 1743.’
The above warrant was renewed in the usual form, and the following tracts of land were laid out by virtue thereof:

The origina! warrant that issued in consequence of the second order being in the possession of the Surveyor the words thereof cannot be inserted, but the following tracts of land were laid out by virtue thereof.

‘P. Thomas. — Lay out for his Excellency Thomas Bladen, three thousand acres of land in any part of this province not formerly surveyed or cultivated by any person, or lands leased or reserved for his Lordship’s use, and return your certificates of survey thereof into his Lordship’s Land Office with all convenient speed, with the name of the place, and of what manor to be held. And for your so doing this shall be your warrant. Given under his Lordship’s Lesser Seal of arms this 16th day of April, 1745. To Capt. Thomas Cressap, Surveyor of Prince Georges county.’ By virtue of the above warrant the following tracts of land were laid out:

By this state of the returns from the Deputy Surveyor, your Excellency will ob *463 serve that there has been laid out for Thomas Bladen, Esq. by virtue of these warrants six thousand three hundred and five acres, of which two thousand two hundred and fifty-four acres are claimed by Mr. Ross; and it is also evident, that five thousand and two hundred acres were surveyed before Mr. Bladen left this Province, which he did in June, 1747, yet he never made good, rights for more than four thousand and twelve acres, which was in 1746.
Your Excellency will observe, that in the order of October, 1743, as well as in the other two of the 15th and 16th of April, 1715, there are these words, ‘caution to be paid on the return of the certificate,’ which is unprecedented, and the more extraordinary as no special order appears, or is referred to.
By the 11th article of his Lordship’s instructions, dated the 14th day of June, 1733, contained in the following words : ‘There shall he in all future common warrants a clause inserted by proviso, that the patent shall be taken out within the space of two years after the dale of such warrant which said clause you arc hereby enjoined so strictly to observe as not to suffer the renewal of said warrants after such time or any patents to issue contrary to the true intent and meaning thereof,’ it is, as your Excellency will observe, expressly ordered, that a conditional clause be inserted in every common warrant enjoining the person obtaining it to sue out patent within two years from the date of such warrant; nevertheless, there is no such proviso or clause in the warrants granted by Mr. Bladen, which are therefore, in that respect, repugnant to his Lordship’s instructions.
We shall conclude our remarks on these warrants with observing, that instead of the usual words, ‘return j'our certificates of survey thereof within six months from the date thereof,’ there are inserted in the warrant of the 16th of April, 1745, the words following, ‘return your certificates of survey thereof into his Lordship’s Land Office with all convenient speed,’ which expression we conceive can never be construed to imply the space of fifteen or sixteen years.
It appears by an old and imperfect memorandum book in the office, that certificates for Buck Lodge, Sugar Bottom, Providence, Turkey Flight, Bigg Bottom, Prized, Lawrence, Cove, and Three Spring Bottom, were returned into this office some time before April, 1747. This Mr. Thomas Cressap, by his letter to us, dated the 6th of April, 1761, seems to admit, or rather insists on; and is supported by the evidence of Col. Thomas Prather, who acted, at that time, as an assistant to Cressap; and by the deposition of one Joseph Tomlinson, which deposition with that of Col. Thomas Prather, and Mr. Cressap’s letter are submitted to your Excellency’s perusal; but we beg leave to remark, that although all certificates are directed to be returned by the deputy Surveyors into the Land Office, there is nothing more common than for the partys themselves, or for others in their behalf to withdraw the same ; nor can it be otherwise, for until the Examiner’s endorsement appears on the back of each certificate as well as his Lordship’s agents’ acknowledgement of composition, the certificate is ineompleat; and as nothing appears to the contrary it is more than probable, if any regard be paid to Tomlinson’s deposition, that this was the case with those certificates delivered into the office for Mr. Bladen, before April, 1747.
Upon the whole, as Mr. Bladen did not pay caution for, or make good rights to more than 4,012 acres, though he had it in his power before he left the Province, and as no person ever applied on his behalf to pay up caution for the remainder until May, 1761, which was after Doctor Ross had obtained his special warrants, and there is a sufficient quantity of land surveyed and unpatented to satisfy both their claims.
*464 Therefore, we are of opinion, that as Mr. Bladen has only as yet obtained patents for 1,696 acres, that patents do issue to him for 2,316 acres more, he paying the arrearages of rent, which compleats his quantity of 4,012 acres, that being the whole for which he has paid caution.
We are also of opinion, that patents do issue to Doctor David Ross, of Prince Georges county, upon the certificates which have been or shall be returned into his Lordship’s Land Office by virtue of the special warrants obtained by him on the 16lh day of January, 1761, amounting, in the whole, to 2,254 acres, he having paid caution for that quantity, unless Mr. Bladen, or his Attorney shall produce an instruction from his late Lordship to support so unusual a proceeding: All which is humbly submitted to your Excellency’s superior judgment, by your Excellency’s humble servants. — B. Calvert, G. Stewart, 11th November, 1762.
13th December, 1765. — Sharpe, Chancellor. — From the foregoing statement, the proceedings on the part of Governor Bladen seems to be very much out of the common course; which, I conceive, no less than the express authority of, and a direction from the late Lord Proprietary could dispense with, either in Mr. Bladen’s or any other person’s case ; and had there been such particular authority from his Lordship, either to the then Judges of the Land Office, his Lordship’s agents, or to the Governor himself, it ought doubtless to have been entered at large, or at least noticed by some entry on record, to the end, that it might always have appeared, that his Lordship, who alone could do it, had dispensed with the usual course of proceeding in the case of Mr. Bladen; and that the judges had sufficient warrant for their justification in proceeding after such a manner. But there being, by your account, no such special authority from his Lordship to be found in the Land Office, which is the proper repository for every thing relating to his Lordship’s grants of lands, nor even the least hint appearing among the records that any such order from his Lordship in favour of Mr. Bladen ever existed, you could not, I apprehend, presume there was any such order.
The affair hitherto being thus circumstanced, and the several surveys for Mr. Bladen having been made on such irregular and unusual warrants, I should have thought, that even if no person had applied for warrants to affect the lands, you would have acted justifiably, had you declined issuing any patents at all on certificates returned in pursuance of such irregular warrants till you could have laid the whole affair before his Lordship, and have received his instruction thereupon. But since Doctor Ross has applied for and obtained warrants to affect several of the tracts which, according to your statement, had been surveyed for Mr. Bladen, the principal thing, now to be considered, seems to be whether Doctor Ross has been regular in his applications; and, whatever may be done with regard to the rest of the lands, whether he has a right to patents for the 2,254 acres for which he obtained warrants.
And with regard to the regularity of Doctor Ross’ application to the office on the present occasion; such special warrants as he obtained, seem to me to have been the proper warrants; for, as the lands in question had been surveyed by virtue of Mr. Bladen’s warrants directed by the office to the Surveyor of the county, and a minute made in the office of the certificates having been returned, they could not, I apprehend, have been afterwards affected by a common warrant; and, by what you say in the foregoing statement, no warrant under the proclamation to affect them, by reason, that no certificates on Mr. Bladen’s warrant were to be found in the office; and, if, under these circumstances, such special warrants as were granted to Doctor Ross would not affect the lands, it seems to me, that a person, for whom land bath once *465 been surveyed, has nothing' more to do than, by a collusion with the Surveyor, or indeed, without such collusion, after his certificate shall have been returned to the office, and there minuted to withdraw it again, under pretence of having it examined, of settling with the agent, or for some other purpose; and, for the future, keeping it in his hands in order totally to prevent his Lordship from receiving one shilling for the land, either from the party himself or by sale of it to any other person.
The warrants granted to Doctor Ross being of such a nature as oblige him, over and above the caution money paid by him at the time they were obtained, to pay far any improvements on the land or cultivation, the Lord Proprietary’s interest seems, in this case, to have been consulted as much, in every respect, as it would have been had warrants issued under the proclamation. Nor do I conceive warrants under the proclamation could do any thing more besides describing the land, and intimating, that the person for whom the same lands was formerly surveyed had neglected to sue out patents within the two years, according to his Lordship’s Ilth instruction, quoted in the above statement.
If then Doctor Ross has been regular in his application and proceedings, did pay the caution money to his Lordship on obtaining his warrants, and has done every thing in his power to entitle himself to patents; while, on the contrary, there has been great irregularity and neglect, at least, on the part of Mr. Bladen; and the laying the former under any difficulties would tend to prevent application to the office for tile future for lands liable to be taken up under his Lordship’s instruction, I am of opinion, with you, that patents should forthwith issue to Doctor Ross for the 2,254 acres by him affected in the manner above stated. — Land Records, lib. B. C. Sr G. S. No. 15, fol. 814.

 1801, Reso. No. 2, 3,4, 5, 6 and 8.

 Cunningham v. Browning, 1 Bland, 320; The Rail Road v. Hoye, 2 Bland, 258.

 Land Ho. Assis. 425.

 Johnson v. Hawn, Land Ho. Assis. 418.

 1745, ch. 9; 1836, ch. 63.

 Giraud’s Lessee v. Hughes, 1 G. & J. 249.

 1836, ch. 63.

 Hale de Portibus, 81; Smith v. Hollingsworth, ante 381.

 Harrison v. Sterett, 4 H. & McH. 540.

 Blundell v. Catterall, 7 Com. Law Rep. 108.

 Chart. of Maryland, s. 4 and 16; 13 Niles’ Reg. 13.

 Land Ho. Assis. 289.

 Mead v. Haynes, 3 Rand. 36.

 2 Hen. Virg. Stat. 456; 1 Hazard’s State Papers, 488.

 Land Ho. Assis. 148; Lord Proprietary v. Jenings, 1 H. & McH. 95; Smith v. The State, 2 H. & McH. 251.
Ritchie v. Sample. — 10th July, 1816. — Kilty, Chancellor. — This caveat came on to be heard in the presence of the parties and by counsel for the defendant. It appears to be a case of considerable importance in its principles, and it would have been desirable to have heard counsel on the caveator's side also, so that the propriety of granting a patent, in such a case, might have been more fully examined.
I am, however, of opinion, that the defendant is not entitled to a patent, as the certificate stands, it being in express terms, for a tract or parcel of the Susquehanna River, comprehending a number of small islands. And the land covered by the water cannot he called grantable land; though possibly islands may have been taken up together, between which the water sometimes flows. It cannot be certainly known what effect a grant of the ten and a quarter acres would have on the river and the fisheries. And it is to be observed also, that, under a patent, the defendant would not be put to a suit to obtain possession, as there would be no person to bring suit against.
The attempt by Ritchie to take up the same land is not conclusive against him, as to the right; because he might have been caveated also; neither is his want of interest, if he has none, an objection, as it is a question involving the propriety of a grant, and the interest of the public. But the defendant may, on application, have an order to caveat his certificate.
Eowlek v. Goodwin. — 1 Oik May, 1809. — Kilty, Chancellor. — The Chancellor in his decision and order in this case, (1 Bland, 327,) noticed the grounds on which they had been supported and opposed in the argument before him.
The surveys which were afterwards made at the instance of the caveator, were laid befo¡-e him on the submission, without any explanation or further argument. And he perceived nothing in them to alter the main principle on which he decided.
It has since been suggested by the caveator, that a large part of the survey, number one, lies in the water of Bell’s Cove, as appears by the plot and explanations, and the deposition of Charles Stewart. Whereupon, patents were directed to be issued in the other cases only — meaning number one.
The defendant, if he is desirous of obtaining a patent on that survey, will have to apply in writing for an order of correction for the purpose of excluding the part so lying in the water, or for such other order as he may think necessary. And any order for correction, or any other purpose that may be wanted by the caveator, must likewise he applied for in writing.

 Browne v. Kennedy, 5 H. &. J. 195; 13 Niles’ Reg. 225; 1833, ch. 254, s. 7.

 1829, ch. 87; Scratton v. Brown, 10 Com. Law Rep. 385; Attorney-General v. Burridge, 6 Exch. Rep. 354.

 1826, ch. 212; 1827, ch. 33; 1828, ch. 54.

 Land IIo. Assis. 147, 157.

 Land Ho. Assis. Append. 9.-

 But a fee simple owner may extend a wharf into a river so as he does not thereby injure the navigation or fishery; 1835, ch. 168.
Hyde’s Case. — To His Excellency Robert Eden, Esquire, and the Honourable Daniel Dulany and John Morton Jordan, Esquires, commissioners for the sale of his Lordship’s lands.
The petition of Thomas Hyde, of the city of Annapolis, humbly shewetb, That your petitioner is seised in fee of a lot of ground on the south-east side of Bishop street, and at the head of the Cove, south-west of the city, which said lot begins at a locust post standing upon the bank by the said Cove; and runs from thence south eighty degrees, west ninety-nine feet to another locust post; then north sixty degrees, west two hundred and seventy feet to another locust post at the end of the line of Bishop’s street; then with Bishop street north-east one hundred and forty-eight feet and one-half, to a locust post of Mr. James Carrol’s lot; then with a straight line to the beginning.
Your petitioner further shewelh to your Excellency and Honours, that your petitioner’s first course extends the whole length of the head of the Cove, and nearly parallel to the same; and that originally the tide-water flowed up to his said course; though now, by the filling up of the Cove for the purpose of a tan-yard, a considerable piece of ground intervenes between your petitioner’s first course and high water mark; which said ground, your petitioner, lo prevent controversies hereafter, is willing to purchase of his lordship. Your petitioner therefore prays a special order for a warrant of resurvey of the said lot and ground; and that, upon paying a reasonable consideration for the said ground, your petitioner may have patent for the same; and your petitioner as in duty bound will pray, &c.
1st Jpril, 1771. — The commissioners for the sale of his lordship’s manors, &c. *470 being of opinion, that they are not empowered to dispose of any land within the city. His Excellency the Governor was pleased to signify, that if Mr. Hyde would petition His Lordship, he would forward the same; and, in the interim, no person whatever could claim any prior title thereto. — M. S.
This shews, that there was then no pre-emption right in the owner of any tract to any vacancy originally existing, or afterwards made, not alluvion, lying between such tract and the tide ; and that such vacancy was considered as land subject, like any other land, to be sold in the Land Office. But in this particular case it was not liable to be so taken up by a warrant of resurvey, because, as appears by the following among other instructions given by the Board of Revenue to His Lordship’s agent and receiver-general, the taking up of any such land had been prohibited by a reserve, the then existence of which must have been the cause why no patent could be granted to Hyde.
30th June, 1768. — ‘A reserve being laid on all vacant land that now is or shall or may be hereafter. found within the city of Annapolis and town of Baltimore, or within five miles round the said city and town, be it by escheat or otherwise, you are not to do any act, that may affect these lands, without particular instructions from His Lordship or this Board.’ — Proceedings of the Board of Revenue, fol. 22 — a, book in the Land Office.

 1745, ch. 9; Harrison v. Sterctt, 4 H. & McH. 540.

 1745, ch. 9.

 April, 1783, ch. 24, s. 8 and 9; 1753, ch. 27.

1) 1745, ch. 9.

 Harrison v. Sterett, 4 H. & McH. 540 ; Smith v. Hollingsworth, ante 381.

 Browne v. Kennedy, 5 H. & J. 195; Ridgely v. Johnson, 1 Bland, 316, note; The King v. Lord Yarborough, 10 Com. Law Rep. 19; Gifford v. Lord Yarborough, 15 Com. Law Rep. 403.
Hammond v. Forbest. — 16th November, 1810. — Kilty, Chancellor. — The hearing of the caveat in this case came on in the Land Office on the 15th, when the exhibits and depositions were read, and the case was argued by counsel on each side.
On consideration, the Chancellor is of opinion, that the caveat ought to prevail, and that the defendant is not entitled to a patent. It does not appear, however, that *472 the ground in question* is connected with the main land by the bar, which is referred to from the letter N. on the plot. An objection might be made from what is stated in the deposiiions, and marked on the plot as to the course of the ferry-boat, which goes over the island, if, in that case, it can be so called, or rather, by the intersection of the water, makes two islands of the land.
But the question is taken up on the general principle of its being an island, and according to the civil law; and according to the decree of the late Chancellor, in the case of Ridgely v. Johnson, (1 Bland, 316, note,) it is considered as belonging to the caveators, as owners of the land on the nearest side, who appear in the part opposite a part of the island to be bounded by the river.
It is therefore Adjudged, Ordered, and Decreed, that the caveat be ruled good.

 1827, ch. 162, s. 4; The Wharf Case, ante 361.

 Bac. Abr. tit. Prerogative, F.

 Line’s Case, 1680. — Al a council held in the Land Office. — Land Records, lib. B. C.fol. 118.

 Hix v. The Attorney-General, Hard. 176; 1799, ch. 79, s. 7; 1805, ch. 93.

 Brown v. Kennedy, 5 II. & J. 195; Blundell v. Catterall, 7 Com. Law Rep. 108.

 Godtitle v. Alker, 1 Burr, 143.

 Hammond v. Godman, 1 Bland, 318, note.